## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **TRACY DILLARD,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:14-cv-02185-AJB** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| ***Commissioner, Social Security*** | : | |
| ***Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Tracy Dillard ("Plaintiff") brought this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the

Social Security Administration ("the Commissioner") denying his application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 9/5/14 & 9/8/14). Therefore, this Order constitutes a final Order of the Court.

("SSI") under the Social Security Act.[2]  For the reasons below, the undersigned **AFFIRMS** the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on or about September 15, 2010, alleging disability commencing on August 23, 2010.  [Record (hereinafter "R") 52-55, 93-102].[3]  Plaintiff's applications were denied initially and on reconsideration.  [*See* R52-55].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R65-66].  An evidentiary hearing was held on September 19, 2012.  [R37-51].  The ALJ issued a decision on November 30, 2012, denying Plaintiff's

---

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled.   Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

[3]      The Court refers to the corrected transcript filed at ECF No. 11.

2

application on the ground that he had not been under a "disability" at any time through the date of the decision. [R21-36]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on May 13, 2014, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then filed an action in this Court on July 10, 2014, seeking review of the Commissioner's decision. [*See* Doc. 1]. The answer and transcript were filed on November 26, 2014, [Docs. 9, 10], and a corrected transcript was filed on December 10, 2014, [Doc. 11]. On December 22, 2014, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 12]; on January 20, 2015, the Commissioner filed a response in support of the decision, [Doc. 13]; and on January 29, 2015, Plaintiff filed a reply brief in support of his petition for review, [Doc. 14]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[4] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[4]    The parties did not request oral argument.  (*See* Dkt.).

## II.   STATEMENT OF FACTS[5]

### A.   Background

Plaintiff claims disability due to paranoid schizophrenia[6] and back pain, [R42-45], and on appeal, he also claims disability due to obesity, [Doc. 12 at 17-19].[7] He was born on February 11, 1968, and therefore was forty-two years old on the alleged onset date and was forty-four years old on the date of the ALJ's decision. [R33, 45, 95]. His date last insured was December 31, 2015. [R103].

### B.   Lay Testimony

At the hearing before the ALJ, Plaintiff testified that he had attended school through the eleventh grade and had later earned a General Educational Development certificate ("GED"). [R40]. He stated that he was five feet, eight inches tall, and weighed 265 pounds. [R40]. He indicated that he had been living with his parents for

---

[5]      In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 12-14].

[6]      "Paranoid type schizophrenia is a mental illness that involves false beliefs of being persecuted or plotted against." MedlinePlus, Schizophrenia - Paranoid Type, http://www.nlm.nih.gov/medlineplus/ency/article/000936.htm (last visited 3/18/16).

[7]      Where the page numbers appearing in the parties' briefs are different from the page numbers assigned by the Court's electronic filing system, the Court uses the page numbers assigned by its electronic filing system.

AO 72A
(Rev.8/8
2)

about two years and had last worked in August 2010, as an unarmed security guard. [R41]. He also reported that he had been on disability from 1992 to 1999 because he kept having paranoid episodes that prevented him from working. [R47].

Plaintiff reported that he had quit his last job when he had a schizophrenic episode and thought that other employees were plotting against him. [R41]. He stated that he was receiving mental-health treatment and was taking medication at the time. [R41-42]. He testified that he did not look for any work after that because he kept having paranoid episodes and could not work around people. [R41-42]. He stated that medication helped and that when he is alone, he does fine, but being around crowds is different. [R42]. He also stated that although he had been receiving mental-health care consistently since 1993, he had never received counseling or education teaching him how to deal with feelings of paranoia. [R45-46].

Plaintiff stated that in addition to the schizophrenia, back pain is also preventing him from working. [R44]. He indicated that he had originally hurt his back in 2004 in an auto accident and hurt it again working for a tree-service company. [R44]. He stated that the back pain limited him to standing for no more than thirty minutes at a time but that he did not have trouble sitting in a regular chair. [R44]. He reported that

5

his pain is at eight on a ten-point scale on a typical day and that he tried Aleve for pain, but it did not work.  [R44-45].

Plaintiff testified that on a typical day, he wakes up, feeds and walks his parents' dogs, cleans his room, and then spends the rest of the day listening to the radio and watching television.  [R43].  He stated that he also visits friends and on weekends visits his adult children.  [R43].  He indicated that he goes to the pharmacy and grocery store about once per month and sometimes becomes paranoid in the grocery store.  [R43].

### C.    Administrative Records

In an adult disability report dated October 28, 2010, Plaintiff reported that he had worked in security from 1995 until August 23, 2010, but that schizophrenia was preventing him from working.  [R115-16].  He stated that his work had involved walking the hotel floors and securing the hotel.  [R116].  He stated that he had been receiving mental-health care since 1984 but was not receiving care for any physical conditions.  [R117-19].

In an adult function report dated November 5, 2010, Plaintiff reported that he was living alone in an apartment.  [R124].  He stated that he isolates himself inside the house because he is paranoid and that he is sometimes unable to sleep because of episodes of paranoia.  [R124-25, 129].  He reported that he does go out to shop for

6

groceries about once every other week but that it is sometimes difficult because he feels like the other customers are talking about him. [R127]. He indicated that he could cook simple meals and take care of his personal needs but has a hard time cleaning and doing laundry because of his bad back. [R126]. He stated that he goes to church as often as he can—at least weekly—where he sits in the back alone and keeps to himself. [R128]. He reported that he has difficulty lifting, squatting, and standing because of his bad back; that he also has difficulty with talking, hearing, concentration, understanding, following instructions, and getting along with others; and that he talks to himself and sometimes hears voices. [R129-30]. He stated that he has some difficulty following instructions: he has to read written instructions two or three times before he can follow them, and he must repeat spoken instructions "over and over" in his head before he understands them. [R129]. He indicated that he gets along with authority figures "OK" but has had difficulties with bosses and co-workers because he thinks that they have something against him or they think that he is crazy, and they try to make him quit. [R130]. He stated that he could walk as far as a mile before needing to stop and rest but that he would be in pain the next day. [R129]. Plaintiff also stated that he does not handle stress well, does not like to deviate from his daily routine, and has schizophrenic episodes when he gets stressed. [R130].

7

In a third-party function report dated February 25, 2011, Plaintiff's mother reported that Plaintiff was living with the family at home. [R135]. She stated that he could do general cleaning but could not do yard work due to his back injury. [R137-38]. She indicated that he goes outside daily, is able to drive himself, and goes shopping weekly for food, personal items, or clothes. [R138]. She also reported that he could isolate for days because of paranoia, could not lift over fifty pounds, could not stand for long periods of time due to numbness and pain, and becomes moody around crowds. [R140-41]. She also explained that Plaintiff sometimes becomes overwhelmed with certain situations, has trouble maintaining relationships at times due to paranoid episodes, and is easily frustrated by others' attempts to make him interact. [R142].

Certified earnings records dated September 17, 2012, indicate that Plaintiff earned $10,783.95 in 1997, $19,392.16 in 1998, $20,514.35 in 1999, $28,138.32 in 2000, $25,312.13 in 2001, $26,658.93 in 2002, $18,422.66 in 2003; had no earnings in 2004; earned $14,341.46 in 2005, $17,967.95 in 2006, $20,602.63 in 2007, $21,407.94 in 2008, $14,037.46 in 2009, and $14,754.00 in 2010; and had no earnings thereafter. [R103-04].

AO 72A
(Rev.8/8
2)

### D.    Medical Records

On February 10, 2003, Plaintiff presented to the West Fulton Mental Health Center for follow-up on mental-health issues.  [R240, 271].  Plaintiff's affect, mood, thought process, orientation, and behavior were all noted to be unremarkable, and he denied any mood or psychotic symptoms.  [R240, 271].  He was prescribed Haldol[8] and Cogentin.[9]  [R240, 271].

At a visit to the West Fulton Mental Health Center taking place on April 21, 2003, Plaintiff was noted to be in a sad mood.  [R237, 268].  He explained that he had been fired the first day he reported to work because the new employer found out he was a mental-health client and told him he failed the physical.  [R237, 268].  Plaintiff also stated that he had quit his old job for the new one and that his old

_____

[8]    Haldol (haloperidol) is in a group of medications called conventional antipsychotics.  It is used to treat psychotic disorders—conditions that cause difficulty telling the difference between ideas that are real and those that are not real. MedlinePlus, Haloperidol, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html (last visited 3/16/16).

[9]    Cogentin (benztropine mesylate) is commonly used to treat symptoms of Parkinson's disease or involuntary movements caused by other medical problems or medications. MedlinePlus, Benztropine Mesylate Oral, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682155.html (last visited 3/16/16).

9

employer would not take him back.  [R237-38, 268].  His current medications were Haldol and Cogentin.  [R238, 269].  The visit was sixty minutes long and included supportive therapy.  [R237, 268].

At a visit to the West Fulton Mental Health Center taking place on May 27, 2003, Plaintiff's affect, mood, thought process, orientation, and behavior were all noted to be unremarkable.  [R236, 267].  It was noted that Plaintiff had been prescribed Haldol and Cogentin, was compliant, and was having no side effects or psychotic symptoms. [R236, 267].

Plaintiff visited the West Fulton Mental Health Center on May 30, 2003, for the purpose of discussing his situation.  [R235, 266].  He reported that he was off disability due to attempts to work but was reapplying for disability after being fired.  [R235, 266]. His affect, mood, thought process, orientation, and behavior were all noted to be unremarkable.  [R235, 266].  It was also noted that Plaintiff was "presently doing okay due to taking medication as prescribed" and was "reporting no symptoms."  [R235, 266].  The appointment lasted for sixty minutes and included supportive therapy, emotional support, and assistance with coping skills.  [R235, 266].

On June 6, 2003, Plaintiff again presented at the West Fulton Mental Health Center.  [R231, 265].  His purposes for the visit were "maintaining stabilization" and

10

"staying well." [R231]. It was also noted that Plaintiff was still out of work. [R265]. Plaintiff reported having hallucinations telling him bad things about people and that people were talking about him. [R231]. He stated that he withdrew from people and was depressed and lonely. [R231]. He was noted to have delusions, hallucinations, a flat affect, depressive symptoms, and paranoia, and it was also noted that he was suspicious. [R231]. It was also observed that Plaintiff was stabilizing on medication and realizing that he needed to stay on medication to reduce his symptoms, including hallucinations, delusional thinking, suicidal thoughts, and depression, particularly when going through stressful situations. [R265]. The sixty-minute appointment included supportive therapy and cognitive therapy, including restructuring and reframing negative thoughts and misconceptions. [R265].

Plaintiff was seen at West Fulton Mental Health Center on June 27, 2003. [R264]. He reported that he had been turned down for disability benefits and was appealing the decision. [R264]. He was observed to be worried about not having income and to have a sad mood. [R264]. He reported no psychotic symptoms. [R264]. The appointment lasted for sixty minutes and included supportive therapy, self-esteem building, and assistance with coping skills and managing stressors. [R264].

11

On December 11, 2003, Plaintiff returned to West Fulton Mental Health Center. [R263]. He reported that he had not seen a doctor since June and had not been taking his medication since July but he wanted to get back on medication. [R263]. He was noted to be delusional, and he stated that he was feeling very paranoid. [R263]. He was prescribed Haldol and Cogentin. [R263].

Notes from the West Fulton Mental Health Center from February 2004 indicate that Plaintiff was having side effects from Risperdal[10] and wanted to go back to Haldol and Cogentin. [R258-60]. His affect, mood, thought process, orientation, and behavior were all noted to be unremarkable, [R259], but it was noted that Plaintiff had become unemployed after a relapse where he became paranoid and had hallucinations, [R260]. He received sixty minutes of therapy on February 4, 2004, and again on February 20, 2004, including supportive therapy, assistance with learning coping skills, and cognitive therapy. [R259-60].

At a visit to the West Fulton Mental Health Center taking place on March 18, 2004, Plaintiff was observed to have a flat affect and sad mood. [R257]. He

---

[10]   Risperdal (risperdone) is in a class of medications called atypical antipsychotics and is commonly used to treat symptoms of schizophrenia. MedlinePlus, Risperdone, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html (last visited 3/16/16).

AO 72A
(Rev.8/8
2)

reported frustration about being denied Social Security disability benefits. [R257]. He also reported no psychosis, due to medications. [R257]. The visit lasted for thirty minutes and included supportive therapy and help with coping skills. [R257].

Plaintiff again visited the West Fulton Mental Health Center on April 21, 2004. [R255]. He denied having any symptoms or side effects. [R256]. It was noted that Plaintiff was showing symptoms of depression, was frustrated by pain in his back and legs, was dealing with his father not speaking to him because he did not understand Plaintiff's illness, and was waiting on a decision regarding an application for disability benefits. [R255]. The visit lasted for sixty minutes and included supportive therapy and exploration of coping skills. [R255]. He continued on Haldol and Cogentin. [R255-56].

Plaintiff visited West Fulton Mental Health Center on June 16, 2004. [R253]. His affect, mood, thought process, orientation, and behavior were all observed to be unremarkable, and he continued on Haldol and Cogentin. [R253-54]. It was noted that Plaintiff was not having delusions or psychiatric symptoms but that he reported being unable to work because of pain in his back and legs. [R253-54].

Plaintiff was seen at West Fulton Mental Health Center on July 14, 2004. [R252]. His affect, mood, thought process, orientation, and behavior were all noted to

13

be unremarkable, and he was observed to be in good spirits.  [R252].  He reported that he was awaiting a disability decision.  [R252].  The visit lasted for sixty minutes and included supportive therapy and a discussion of coping skills and managing daily stressors.  [R252].

Notes from a biopsychosocial assessment from the same date indicate that Plaintiff began having mental health problems in his teenage years and had been hospitalized for them, the most recent time in 1985.  [R225].  It was observed that his affect and mood were good with medication and that his paranoid delusions, auditory hallucinations, and suicidal ideation were absent with medication.  [R226-27].  Notes also indicate that Plaintiff had been on disability and was having to reapply:  he attempted to work in security jobs but his illness became worse under the stressors of working and he had to leave his job because he was not doing well.  [R229].  Plaintiff was diagnosed with schizophrenia, paranoid, residual, and was assigned a Global Assessment of Functioning ("GAF") score of 60.[11]  [R230].  The clinic planned to

---

[11]      The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

14

continue Plaintiff on medication and to continue to provide him counseling and individual therapy.  [R229].

Plaintiff visited the Grady Health System Emergency Care Center on July 26, 2004, with complaints of lower-back pain radiating to his left anterior thigh. [R200, 202].   He reported a loss of sensation and pain at nine on a ten-point scale. [R200].  He was found to have no neurodeficits, a straight-leg test was negative, and his strength was noted to be 5/5.  [R200].  A lumbar x-ray was negative for acute and chronic changes.  [R201].  He was prescribed Motrin[12] and discharged. [R201].

Plaintiff again visited West Fulton Mental Health Center on August 25, 2004. [R249].  Plaintiff's affect, mood, thought process, orientation, and behavior were all noted to be unremarkable, and it was further noted that he was in a good mood and was cooperative and open.  [R249].  Plaintiff was observed to be stabilizing on medication. [R249].   The appointment was for sixty minutes and included supportive therapy. [R249].  Plaintiff was continued on Haldol and Cogentin.  [R250].

---

[12]      Motrin (ibuprofen) is prescribed for relief of mild to moderate pain. M e d l i n e P l u s ,   I b u p r o f e n , https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html  (last visited 3/16/16).

15

Plaintiff returned to Grady for follow-up on his back pain on September 16, 2004.  [R198].  He reported lower-back pain radiating to his left leg following a motor vehicle accident.  [R198].  He reported onset of pain with long periods of standing or walking and stated that Advil was not helping.  [R198].

Plaintiff again returned to Grady on October 28, 2004, for follow-up on his back pain.  [R189].  He reported that he was still having lower-back pain but had not filled a prescription for diclofenac.[13]  [R189].  It was noted that an MRI of Plaintiff's lumbar spine taken on September 28, 2004, had revealed congenital spinal canal stenosis and bulging disks at L4, L5, and S1.  [R189].  The attending physician agreed with referring Plaintiff to neurosurgery and recommended that he take diclofenac for pain.  [R189].

Plaintiff returned to West Fulton Mental Health Center on November 8, 2004.  [R247].  Plaintiff's affect, mood, thought process, orientation, and behavior were all noted to be unremarkable.  [R247].  It was observed that Plaintiff was discouraged because he had been turned down for Social Security benefits and had been told that the appeal would take about a year, but it was also noted that he was denying

---

[13]     Diclofenac is an anti-inflammatory medication used to relieve mild to moderate pain.  MedlinePlus, Diclofenac, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html (last visited 3/16/16).

16

depression, symptoms, and side effects, and was managing his disappointment. [R247-48]. It was also noted that Plaintiff continued to keep appointments, remained compliant with medication, and was making progress. [R247]. The visit lasted for sixty minutes and included supportive therapy, cognitive therapy, and discussion of behavior-modification techniques. [R247]. Plaintiff continued with his prescriptions for Haldol and Cogentin. [R248].

At a visit to West Fulton Mental Health Center on December 15, 2004, Plaintiff denied being in a depressed mood, having hallucinations, or having paranoid thoughts. [R246]. He was noted to be in a good mood because he had found a job. [R246]. It was also noted that Plaintiff continued to live independently. [R246].

Plaintiff was again seen at West Fulton Mental Health Center on December 29, 2004. [R245]. Plaintiff's affect, mood, thought process, orientation, and behavior were all noted to be unremarkable, and he denied having any symptoms or side effects. [R245]. He reported that he was starting a new job as a security guard the following week. [R245].

Plaintiff returned to West Fulton Mental Health Center for a follow-up visit on November 8, 2005. [R234]. He reported no symptoms or side effects; denied having any delusions or hallucinations; and indicated that he was still working. [R234]. His

17

affect, mood, thought process, orientation, and behavior were all noted to be unremarkable. [R234].

Notes from a visit to the West Fulton Mental Health Center taking place on February 13, 2006, indicated that Plaintiff's affect, mood, thought process, orientation, and behavior were unremarkable and that he reported he was stable with medication and was "doing fine." [R233]. He also reported that he had been stable in his job as a security officer since April 2005. [R233].

Plaintiff had a biopsychosocial assessment at West Fulton Mental Health Center on July 26, 2006. [R219]. Plaintiff reported that he was not having any symptoms at the time. [R219, 223]. He also reported that he had been working in his job for about a year without any problems. [R221]. He was assigned a GAF score of 70.[14] [R224].

At an appointment taking place at West Fulton Mental Health Center on November 14, 2006, Plaintiff reported that he was living with his parents and stated that he was "doing fine." [R207]. He reported having been in his job for one year and

---

[14]    A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

18

seven months.  [R207].  He was noted to be stable on medication and was assigned a GAF score of 75 to 80.[15]  [R208].

On November 30, 2007, Plaintiff returned to West Fulton Mental Health Center. [R205].  He stated that he was employed full time, was living with his parents, and was "doing fine."  [R205].  He was still taking Haldol and Cogentin and was observed to be stable on medication.  [R205].  He was assigned a GAF score of 85.[16]  [R206].

Plaintiff visited West Fulton Mental Health Center again on December 6, 2007. [R217].  He reported that his symptoms were stable and under control and that he was living with his parents; working full time; managing his own finances; liked to go to movies, plays, comedy clubs, and concerts; and was attending church two to three times per month.  [R210-12, 216].  He also reported that although he went to school only through the tenth grade, he obtained a GED in 1987.  [R211].  He stated that his hope

---

[15]    A GAF score in the range of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  DSM-IV-TR at 34.

[16]    A GAF score in the range of 81 to 90 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."  DSM-IV-TR at 34.

19

for the future was to have a "normal, stable life." [R212]. He was assigned a GAF score of 85. [R217].

Plaintiff continued treatment at the West Fulton Mental Health Center. [R323-44, 352-55]. At visits taking place in January, March, May, August, and November 2008, February, April, September, and October 2009, and February and June 2010, Plaintiff reported "doing fine" and denied having hallucinations or delusions. [R343 (1/25/08), 342 (3/21/08), 340-41 (5/22/08), 339 (8/14/08), 338 (11/13/08), 337 (2/5/09), 336 (4/30/09), 335 (9/17/09), 334 (10/28/09), 333 (2/16/10), 332 (6/2/10)]. On September 15, 2010, however, Plaintiff reported that he had lost his job because he was feeling paranoid for several weeks and had not been going to work. [R331]. At a visit taking place on February 8, 2011, he reported that he was again doing fine, had been going to exercise at the gym, did not feel paranoid anymore, and was trying to get reinstated on disability. [R328].

Plaintiff received a consultative psychological evaluation from Steven Berger, Ph. D., on March 15, 2011. [R278-83]. Plaintiff arrived with his mother. [R278]. He reported that he was living with his parents and was unable to work because of a back injury and symptoms of schizophrenia. [R278]. He indicated that he left school in the eleventh grade and later completed a GED in 1987. [R279]. He stated that he meets

20

with a psychiatrist approximately every three months and had been prescribed haloperidol and benztropine. [R279]. He reported that his auditory hallucinations are generally well-controlled with medication but that he still experiences paranoid delusions. [R279]. He stated that he had worked as a security guard from May 2009 through August 2010 but quit due to paranoid delusions. [R279]. He also reported having worked as a security guard from April 2005 through January 2008 and quitting under similar circumstances. [R279]. He indicated that he hurt his back working with a tree service company in 2003 and had experienced some limitation since then. [R279]. He stated that he had a driver's license and drove regularly. [R279]. He reported having one friend, attending church regularly, and having as his leisure activities "listening to the radio and watching TV." [R279-80].

Dr. Berger diagnosed paranoid schizophrenia. [R281]. He opined that Plaintiff has the ability to understand, remember, and carry out simple instructions; his concentration is adequate for basic work-related functions; and he could adhere to a typical work schedule and maintain an adequate pace in a work setting. [R281]. He also observed that Plaintiff's auditory hallucinations seemed to be well controlled by medication but that his delusional symptoms seemed not to be. [R281]. Dr. Berger recommended psychotherapy targeted at teaching Plaintiff skills to manage his

21

AO 72A
(Rev.8/8
2)

delusional thinking and opined that without such added treatment, Plaintiff was likely to repeat his pattern of quitting jobs after a year or more due to paranoid delusions. [R281].

On March 24, 2011, Plaintiff had a consultative physical examination with David K. Pack, M.D. [R292-98]. Plaintiff reported that he had injured his back in an auto accident in 2004 and had also hurt it while working as a tree service man. [R292]. He stated that he had x-rays at the time but had not seen a doctor since then. [R292]. He complained of on-and-off pain in the low middle back that radiates to both legs and increases with prolonged sitting, standing, or walking. [R292]. He denied numbness or tingling. [R292].

Dr. Pack noted that Plaintiff was 66 inches tall and weighed 266 pounds. [R293]. He found that Plaintiff had normal muscle strength and sensation in both legs; normal posture, stance, and gait, including heel-and-toe walks and squatting; and normal range of motion in his back and legs. [R293-95]. Plaintiff was also noted to have no problem with his upper extremities. [R297]. X-ray studies of Plaintiff's spine showed mild degenerative changes anteriorly, involving numerous mid- and lower-thoracic vertebral bodies; mild degenerative changes anteriorly at C3-C4, with narrowing of the disc space and anterior osteophyte formation; narrowing of the L5-S1 disc space; and

22

minimal changes anteriorly at L4 and L5.  [R285, 287, 289, 293, 298].  Dr. Pack opined that Plaintiff should be able to handle his activities of daily living independently. [R297].

Consulting physician Dr. Model Neway reviewed Plaintiff's record and provided a medical opinion on April 15, 2011.  [R299-306].  He repeatedly noted Plaintiff's obesity as he reviewed the records.  [*See* R299-303].  Dr. Neway opined that Plaintiff was capable of light work, limited to frequent climbing on ramps and stairs, balancing, and kneeling; occasional stooping, crouching, and crawling; no climbing on ladders, ropes, or scaffolds; and no concentrated exposure to hazards such as machinery or heights.  [R300-01, 303].

On April 27, 2011, consulting psychiatrist George Grubbs, Psy. D., completed a psychiatric review.  [R307-19].  He opined that Plaintiff's schizophrenia was not a severe impairment, stating that Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  [R307-19].

Plaintiff continued treatment at the West Fulton Mental Health Center.  At visits taking place in May 2011 and August 2011, he reported "doing fine" and denied having hallucinations or delusions.  [R327 (5/3/11), 326 (8/4/11)].  At the visit to the West

23

Fulton Mental Health Center taking place on August 4, 2011, Plaintiff stated that his goals were to take his medication and get back to work.  [R326].  At a visit on October 25, 2011, he denied hallucinations or delusions, but he also stated that he was avoiding crowds and felt that people were talking about him and plotting against him. [R325].  He was again counseled about the need for medication titration for better symptom control and functioning, and after he initially refused, he eventually agreed. [R325].  At visits in January and May 2012, Plaintiff again reported doing fine and denied having hallucinations or delusions.  [R324 (1/20/12), 323 (5/4/12)].

On May 23, 2012, Plaintiff was seen at Grady Hospital for complaints of chronic low-back pain.  [R346-50].  Plaintiff reported pain that comes and goes and is associated with prolonged periods of standing, heavy lifting, and bending down. [R347].  He stated that the pain was 8/10 in intensity and was shooting down his legs. [R347].  X-rays showed asymmetric disc-height loss L3-L4 through L5-S1, compatible degenerative disc disease, and no other abnormalities.  [R346].  Plaintiff was noted to have a normal range of motion, no point tenderness, a normal gait, full motor strength, and normal sensation in both legs, and a straight-leg test was normal.  [R347].  The doctor assessed Plaintiff with chronic back pain likely secondary to osteoarthritis and

AO 72A
(Rev.8/8
2)

obesity.  [R348].  Plaintiff was counseled to lose weight, perform weight-bearing exercises as tolerated, and take extra-strength Tylenol for pain.  [R248].

At an appointment at the West Fulton Mental Health Center on August 6, 2012, Plaintiff denied any symptoms or side effects.  [R352].  He stated that he was living with his parents.  [R352].  He reported that he had last worked in 2010, when he became paranoid and quit his job.  [R352].  He was continued on Haldol and Cogentin and assigned a GAF score of 75.  [R353-54].

### E.    Vocational-Expert Testimony

The ALJ asked the vocational expert ("VE") about jobs available to a person of Plaintiff's age, education, and work experience, who is limited to light work with no climbing ladders, ropes, or scaffolds, only frequent climbing of ramps and stairs, balancing, and kneeling, and only occasional stooping, crouching, and crawling, who must avoid concentrated exposure to unprotected heights, and who is limited to understanding, remembering, and carrying out simple to semi-detailed tasks and infrequent and casual contact with the general public.  [R48-49].  The VE testified that the hypothetical person could not perform Plaintiff's past work but that the person could work light, unskilled jobs including assembler, collator operator, and house sitter. [R49].

25

## III.   ALJ'S FINDINGS OF FACT

In his written decision, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   The claimant has not engaged in substantial gainful activity since August 23, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: schizophrenia (paranoid type), degenerative disc disease, and obesity (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [("RFC")] to perform a limited range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  The claimant's ability to perform the full range of light work is compromised by limitations that prevent him from climbing ladder[s]/ropes/scaffolds and other postural limitations that limit the claimant to no more than occasional stooping, crouching, and/or crawling during an

26

eight-hour workday.  The claimant is able to frequently balance, kneel, and climb ramps and/or stairs during an eight-hour workday. From an environmental perspective, the claimant should avoid concentrated exposure to unprotected heights.  Due to his mental impairment, the claimant is limited to performing simple to semi-detailed tasks; and he can tolerate no more than infrequent, casual contact with the public.

. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on February 11, 1968, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

27

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 23, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R26-33].

The ALJ explained that he found Plaintiff's lower-back pain limiting only to the extent set forth in the RFC because Plaintiff had been able to sustain gainful employment through 2010 despite the musculoskeletal complaints; recent medical imaging showed no more than minimal degenerative changes; treatment records indicated that Plaintiff's symptoms were managed with over-the-counter pain medication; in the March 2011 consultative physical examination, Plaintiff exhibited a full range of motion and normal strength in his extremities; and his doctors recommended no more than conservative treatment. [R30]. The ALJ further explained that although he gave Plaintiff the benefit of the doubt in finding his schizophrenia to be a severe impairment, he found that it did not to cause more limitation than that set forth in the RFC because Plaintiff had been capable of sustaining full-time employment as a security guard for many years with only a brief period of unemployment in 2004; there was "nothing in the record to support finding [Plaintiff] experienced an exacerbation of symptoms to explain being unable to sustain employment at this time,"

28

and the records in fact indicate that in 2011 and 2012, Plaintiff denied having hallucinations or delusions.  [R30-31].

The ALJ also specified that he gave "great weight" to Dr. Pack's opinion because it is consistent with the objective medical evidence and Plaintiff's level of physical functioning.  [R31].  He further stated that he gave "great weight" to Dr. Berger's opinion that Plaintiff is fully capable of unskilled employment with proper treatment. [R31].  The ALJ also indicated that he gave "great weight" to the opinions of the state-agency consultants' assessments because the objective evidence of record supports finding that Plaintiff's mental impairment is not severe and that he is capable of performing light work with minimal limitations.  [R31].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic

AO 72A
(Rev.8/8
2)

techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11ᵗʰ Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11ᵗʰ Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age,

AO 72A
(Rev.8/8
2)

education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983),

31

*superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in*

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.     SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits

by the Commissioner.  Judicial review of the administrative decision addresses three

questions:  (1) whether the proper legal standards were applied; (2) whether there was

substantial evidence to support the findings of fact; and (3) whether the findings of fact

resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296

(N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If

substantial evidence supports the Commissioner's factual findings and the

Commissioner applies the proper legal standards, the Commissioner's findings are

conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v.

Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529

(11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam);

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth

v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

AO 72A
(Rev.8/8
2)

## VI.   CLAIMS OF ERROR

Plaintiff contends that the ALJ erred by "assess[ing] mental limitations that are unexplained, unsupported, and contradictory," arguing more specifically that the ALJ erred by limiting Plaintiff's ability to interact with the public but not limiting his ability to interact with supervisors and coworkers; by improperly evaluating Plaintiff's ability to handle stress; by misinterpreting Dr. Berger's opinion; and by reaching a mental RFC finding that is "unsupported and contradictory."  [Doc. 12 at 4, 9-17].  Plaintiff also argues that the ALJ erred by failing to explain how Plaintiff's obesity affected his ability to function.  [*Id*. at 4, 17-19].  The Court first considers Plaintiff's allegations of error pertaining to the ALJ's consideration of his obesity and then turns to his arguments regarding his mental limitations.

### A.   *Obesity*

Plaintiff contends that the ALJ erred in his consideration of Plaintiff's obesity. He argues that although the ALJ found that Plaintiff's obesity is a severe impairment and acknowledged that Social Security Ruling ("SSR") 02-1p[17] recognizes that obesity

---

[17]    Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are

AO 72A
(Rev.8/8
2)

can limit exertional and postural functions, the ALJ erred by failing to adequately explain why he determined that despite Plaintiff's obesity and degenerative disc disease, he could nevertheless perform the "good deal of walking or standing" that sustained light work requires.   [Doc. 12 at 18-19 (citing *Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review."); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (discussing the ALJ's duty to explain the basis for the ultimate decision so that the reviewing court may determine whether it was rational and supported by substantial evidence))].   He also points out that the Commissioner and this Court have recognized that obesity can reasonably be expected to increase pain in joints—such as those in the back—that bear weight, [Doc. 12 at 18 (citing *Michel v. Astrue*, No. 1:08-CV-2470-CAM-AJB (N.D. Ga. July 24, 2009), ECF No. 12 at 27-29 (adopted Sept. 3, 2009); SSR 02-1p)], and that doctors at Grady

_____

entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A
(Rev.8/8
2)

thought that Plaintiff's chronic back pain was likely secondary to osteoarthritis and obesity, [R348].  [Doc. 12 at 18-19].

The claimant's residual functional capacity is the most activity in a work setting that a claimant can still do despite his limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In assessing the RFC, the ALJ is to use "all of the relevant medical and other evidence."  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  "[T[he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986), *cited in Reynolds-Buckley v. Comm'r of Soc. Sec.*, 457 Fed. Appx. 862, 865 (11th Cir. Feb. 9, 2012).  When obesity is a medically determinable impairment, the ALJ must consider the functional limitations resulting from obesity in making an RFC assessment.  SSR 02-1p, 2000 WL 628049 at *7.  As noted in SSR 02-1p, "[t]he effects of obesity may not be obvious," and "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity."  SSR 02-1p, 2000 WL 628049 at *6.

Here, the undersigned concludes that the ALJ did not err in evaluating Plaintiff's obesity.   Although Plaintiff did not allege that obesity was among his severe

36

impairments, the ALJ acknowledged diagnoses of obesity in the medical record, along with evidence to support the diagnoses, including Plaintiff's height, weight, and body-mass index ("BMI"), and he concluded that Plaintiff's obesity was a severe impairment. [R26, 29]. The ALJ found, however, that Plaintiff's obesity did not preclude performance of a limited range of light work, explaining that: (1) he gave "great weight" to the opinion of consultative examining physician Dr. Pack, who examined Plaintiff in March 2011, when Plaintiff weighed 266 pounds, [R31, 292-93], and found normal strength, full range of motion in the extremities, slight limitation of range of motion in Plaintiff's lower back, normal posture, stance, and gait, ability to heel-toe walk and squat, and only mild degeneration in the spine, and opined that Plaintiff should be capable of performing activities of daily living independently and has no limitations in his upper extremities, [R29-31]; (2) he gave "great weight" to the April 2011 opinion of state agency consulting physician Dr. Neway, who expressly took Plaintiff's obesity into account and opined that Plaintiff was capable of light work, limited to frequent climbing on ramps and stairs, balancing, and kneeling; occasional stooping, crouching, and crawling; no climbing on ladders, ropes, or scaffolds; and no concentrated exposure to hazards such as machinery or heights, all of which the ALJ accommodated in the RFC, [R28, 31, 299-306]; (3) more recent x-rays showed no more

37

than minimal degenerative changes, [R30, 345-50]; and (4) while the physician who treated Plaintiff for back pain in May 2012 stated the impression that Plaintiff's chronic back pain was likely secondary to osteoarthritis and obesity, the physician also noted that Plaintiff exhibited normal range of motion and was prescribed only over-the-counter Tylenol to alleviate the pain, [R29, 345-50]. It is therefore clear that the ALJ considered Plaintiff's obesity himself and also relied upon the opinions of medical experts who considered Plaintiff's obesity; thus, the ALJ's statement that he evaluated Plaintiff's obesity in light of SSR 02-1p is supported by substantial evidence. [R29].

Moreover, Plaintiff does not argue that it was improper for the ALJ to give the medical opinions great weight, nor does he point to medical evidence indicating that his limitations—due to back pain, obesity, or a combination of the two—are greater than those appearing the RFC. [Doc. 12 at 17-19; Doc. 14 at 10-11]. Plaintiff suggests that obesity exacerbates the effect of mild degenerative disc disease on a person's ability to work, [Doc. 12 at 18-19], but even assuming this is generally true, this proposition is not useful here because it is untethered to medical evidence in this case showing that Plaintiff's limitations exceeded the RFC. It is obviously the case that obesity may exacerbate limitations imposed by other conditions—this is a dominant thread of SSR 02-1p—but the question for the undersigned in this case is whether

substantial evidence exists to support the ALJ's conclusion that Plaintiff's obesity does not preclude a limited range of light work.  In other words, while Plaintiff wishes to appeal to general propositions, the undersigned must look to the *medical evidence of record.  See Broz v. Astrue*, No. 3:07cv204/RV/EMT, 2008 WL 1995084, at *14-15 (N.D. Fla. May 5, 2008) (no error in ALJ's failure to find that claimant's obesity was a severe impairment where "the court has found no indication that any of Plaintiff's physicians suggested that his weight imposed additional work-related restrictions, and Plaintiff has not pointed the court to any such suggestion"); *see also Wind*, 133 Fed. Appx. at 690-91 (ALJ did not err in failing to include obesity in list of severe impairments where, "as the ALJ explained in his decision, the record contains no evidence showing that Wind's obesity affected her ability to perform medium work-related activities").  Here, the medical evidence does not support Plaintiff's conclusions, but it does support the ALJ's, as the ALJ clearly considered the effect of Plaintiff's obesity in combination with the other impairments, [R29-31].[18]  *See Wheeler*

---

[18]      Plaintiff states that his BMI places him in the "extreme" category of obesity.  [Doc. 12 at 17].  The Court notes, however, that the descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) are not determinative and that it is instead necessary for the ALJ to an individualized assessment of the impact of obesity on an individual's functioning.  SSR 00-3p, 2000 WL 33952015 at *4.

*v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (indicating that ALJ's conclusion that claimant is "not suffering from any impairment, or a combination of impairments of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months" is sufficient to indicate that ALJ considered the combined effect of impairments), *cited in Rolack v. Astrue*, No. 8:07-CV-435-T-26EAJ, 2008 WL 1925092, at *3 (M.D. Fla. Apr. 29, 2008), and *Warren v. Astrue*, Civ. Action No. 1:09-CV-1408-TWT-ECS, 2010 WL 3294186, at *6 (N.D. Ga. July 14, 2010) (Scofield, M.J.) (Report and Recommendation), *adopted by* 2010 WL 3294182 (N.D. Ga. Aug. 20, 2010) (Thrash, J.).   Because substantial evidence supports the conclusion that Plaintiff's obesity—either alone or in combination with his other impairments—does not preclude his ability to perform work falling within the limitations set forth in the RFC, the Court finds no reversible error in the ALJ's treatment of Plaintiff's obesity.

### B.    *Mental Limitations*

As noted above, Plaintiff also contends that the ALJ erred in his assessment of Plaintiff's mental limitations. [Doc. 12 at 4, 9-17]. The Court first considers Plaintiff's argument that the ALJ misinterpreted Dr. Berger's opinion, then looks to Plaintiff's allegations that the ALJ improperly evaluated Plaintiff's ability to handle stress, next

AO 72A
(Rev.8/8
2)

considers Plaintiff's contention that the ALJ erred by only limiting Plaintiff's ability to interact with the public, and finally addresses Plaintiff's assertion that the mental RFC finding was "unsupported and contradictory."

### 1.    *Interpretation of Dr. Berger's Opinion*

The Court first considers Plaintiff's contention that the ALJ erred in his consideration of Dr. Berger's opinion.  [Doc. 12 at 14-16].  Plaintiff raises three arguments in support of the allegation of error:  (1) that Dr. Berger's opinion did not state that Plaintiff was "fully capable of unskilled employment with proper treatment" but instead said only that Plaintiff would "likely benefit from psychotherapy" and that without such added treatment it was "highly likely" that Plaintiff would repeat his pattern of inability to sustain work due to paranoid delusions, [*id.* at 14-15 [citing R281]]; (2) even if the ALJ properly interpreted Dr. Berger's opinion, the opinion implies only that Plaintiff is *not* presently capable of unskilled employment because he has not had the benefit of psychotherapy, [Doc. 12 at 15]; and (3) the ALJ improperly assumed that the recommended treatment is available to Plaintiff, [*id.* at 15-16 (citing *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986) ("If . . . the claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling continues to be disabling in law."); *Rezaei v. Astrue*,

AO 72A
(Rev.8/8
2)

Civ. Action No. 11-0467-N, 2012 WL 2979014, at *4 (N.D. Ala. July 20, 2012) (remanding where ALJ had *sua sponte* rejected plaintiff's testimony of limited access to medication despite lack of evidentiary basis in record for ALJ's determination that plaintiff had access to free or low-cost sources); *Traylor v. Astrue*, Civ. Action No. 1:08CV785-SRW, 2010 WL 920114, at *4 (M.D. Ala. Mar. 11, 2010) (finding error where ALJ had *sua sponte* rejected plaintiff's testimony of inability to afford medical treatment despite lack of record evidence for ALJ's determination that plaintiff had access to free or low-cost sources))].

As Plaintiff points out, the Commissioner failed to respond to his challenges to the ALJ's consideration of Dr. Berger's opinion. [*See* Doc. 13, *passim*]. Be that as it may, the Court concludes that Plaintiff has not demonstrated grounds for reversal.

With regard to Plaintiff's first point, the Court finds that it was reasonable for the ALJ to interpret Dr. Berger's opinion as stating that Plaintiff "is fully capable of unskilled employment with proper treatment." [R31]. It is true that in his written opinion, Dr. Berger stated that without psychotherapy targeted at teaching Plaintiff skills to manage his delusional thinking, Plaintiff would be likely to quit another job after a year or more due to paranoid delusions. [R281]. However, Dr. Berger also stated that Plaintiff "has the ability to understand, remember, and carry out simple

42

instructions," "[h]is concentration is adequate for basic work-related functions," and "[h]e can adhere to a typical work schedule and maintain an adequate pace in a work setting," and that he "would likely benefit" from psychotherapy targeted at teaching him skills to manage his delusional thinking. [R281]. It appears that the ALJ made the logical assumption that the corollary to an opinion that Plaintiff "has the ability to understand, remember, and carry out simple instructions," "[h]is concentration is adequate for basic work-related functions," "[h]e can adhere to a typical work schedule and maintain an adequate pace in a work setting," and he would benefit from psychotherapy targeted at teaching him skills to manage his delusional thinking and was likely to quit another job after a year or more if he *did not* receive the therapy is an opinion that Plaintiff would be able to maintain employment indefinitely if he *did* have the benefit of receiving the therapy. Thus, the undersigned finds no reversible error in the ALJ's determination that Dr. Berger's opinion suggests that Plaintiff "is fully capable of unskilled employment with proper treatment." [R31].

As to Plaintiff's second argument, the undersigned does not agree that the only reasonable interpretation of Dr. Berger's opinion is that Plaintiff is not currently capable of maintaining unskilled employment. [*See* Doc. 12 at 15]. As Plaintiff points out, Dr. Berger opined that Plaintiff's delusional symptoms seemed not to be well

43

controlled by medication, that Plaintiff's description of quitting jobs after a period of one year or more due to paranoid delusions was plausible, and that without the added treatment, Plaintiff would be likely to repeat the pattern on his next job.  [R281]. However, Dr. Berger also noted that Plaintiff had held his last job for more than one year and had held a previous job for nearly three years, and he found on examination that Plaintiff did not demonstrate any signs of impaired reality testing and did not appear to be psychotic or delusional during the evaluation.  [R279-80].  Additionally, Dr. Berger found that Plaintiff "has the ability to understand, remember, and carry out simple instructions," that "[h]is concentration is adequate for basic work-related functions," and that "[h]e can adhere to a typical work schedule and maintain an adequate pace in a work setting."  [R281].  Thus, the Court is not persuaded that the ALJ was unreasonable in finding Dr. Berger's opinion compatible with a present ability to perform the limited range of light work stated in the RFC.

The Court is also not persuaded that the ALJ impermissibly assumed that therapy was available to Plaintiff.  Contrary to Plaintiff's representations, there is ample evidence in the record that Plaintiff received not only medication therapy but also received psychotherapy and counseling from the West Fulton Mental Health Center. [*See, e.g.*, R235, 237, 247, 249, 252, 255, 257, 259-60, 264, 266, 268].  There is also

44

evidence that Plaintiff can and does drive. [R127, 138, 279]. Thus, the Court finds this case distinguishable from the authority relied upon by Plaintiff, where there was no record evidence showing access to treatment, *see Taylor*, 782 F.2d at 1298; *Rezaei*, 2012 WL 2979014 at *4; *Traylor*, 2010 WL 920114 at *4, and concludes that there was substantial evidence in the record to support the ALJ's implicit determination that Plaintiff had access to counseling services.

For all of these reasons, the undersigned finds no reversible error in the ALJ's consideration of Dr. Berger's opinion.

### 2.     *Ability to Cope with Stress*

Plaintiff also argues that the ALJ erred in evaluating his ability to handle stress. [Doc. 12 at 13-14]. Plaintiff recognizes that the ALJ explained that he discounted Plaintiff's report that he is unable to handle stress and changes in routine because Plaintiff also admitted that he is capable of finishing tasks. [*Id.*]. Plaintiff contends, however, that he never made such an admission. [*Id.* [*comparing* R27 *with* R124-31, 229]]. Plaintiff therefore argues that there is no record evidence suggesting that stress does not impact his ability to work, and thus, that the ALJ should have credited Plaintiff's report that he is unable to handle stress and changes in routine, the treatment notes indicating that Plaintiff's illness became worse under the stressors of

45

working, and the treatment notes indicating that he had to leave his job because he was not doing well.  [Doc. 12 at 13-14 [citing R124-31, 229]].  Plaintiff contends that the ALJ consequently erred by failing to limit the RFC to low-stress work.  [Doc. 12 at 14].

Again, the undersigned finds no basis for reversal in Plaintiff's arguments. Despite Plaintiff's allegation to the contrary, the factual basis for the ALJ's finding that Plaintiff is capable of completing tasks is clear:  on the questionnaire the ALJ cites in support of the finding, Plaintiff was asked, "Do you finish what you start? (For example, a conversation, chores, reading, watching a movie)," and Plaintiff checked "Yes."  [R129].  Thus, the record does in fact show that Plaintiff admitted that he is capable of finishing tasks.

Moreover, as the Commissioner points out in her response brief, the treatment notes Plaintiff cites as showing that his illness became worse under the stressors of working and that he had to leave his job because he was not doing well are from a *July 2004* visit to West Fulton Mental Health Center, [R229], and the ALJ recognized that after that visit, Plaintiff resumed and sustained work for years, despite having the same diagnosis and symptoms.  [Doc. 13 at 17 [citing R30, 48, 116, 144-51]; *see also* R104 (indicating that Plaintiff earned at least $14,000, and as much as $21,407.94, each year from 2005 through 2010)].  Thus, the medical record does not support Plaintiff's

46

suggestion that from the time he reported that his schizophrenia became worse under the stressors of working, he was indeed unable to maintain sustained employment.

Accordingly, the Court concludes that substantial evidence supports the ALJ's determinations regarding Plaintiff's ability to cope with stress.

### 3. Social Limitations

Plaintiff also contends that the ALJ erred when he limited Plaintiff to "no more than infrequent, casual contact with the public" but did not impose any limitations on Plaintiff's ability to interact appropriately with coworkers and supervisors. [Doc. 12 at 9-13 (analogizing *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *Pfeiffer v. Astrue*, 576 F. Supp. 2d 956, 962 (W.D. Wis. 2008))]. In support of the argument, Plaintiff points to his own statements and Dr. Berger's opinion, which he contends show that he has difficulty dealing with people, including difficulties at past work with coworkers and supervisors, [R41-43, 130-31, 279, 280-81, 325, 331]; he asserts that the ALJ accepted that Plaintiff has difficulty getting along with authority figures due to paranoid thoughts but "inexplicably" considered the difficulty only with regard to Plaintiff's limitations in concentration, persistence, or pace, [R27]; and he points to the ALJ's acknowledgment of Dr. Berger's opinion that Plaintiff has social-functioning limitations due to delusional thinking, [R30]. [Doc. 12 at 9-11].

47

Plaintiff further contends that the evidence does not support a finding that he could have even occasional interactions with the public, given his and his mother's reports that he "mostly stay[s] at home alone because [he's] paranoid and afraid of the outside world," continues to have paranoid episodes, and is easily frustrated by others' attempts to make him interact. [*Id*. at 12 [citing R124, 127-29, 131, 142, 281, 325, 352]]. Plaintiff also argues that although the ALJ correctly noted that Plaintiff does go to church and interact with his family, he erred by ignoring evidence that Plaintiff keeps to himself at church and interacts with family on the telephone. [Doc. 12 at 12 [citing R27, 124, 128]]. Plaintiff also points out that since he quit work in 2010, he no longer has the stressors or working around people, and thus, the fact that he denied having hallucinations and delusions in 2011 and 2012 should not be understood to show that he is able to work. [*Id*. at 13 [citing R42-43]]. In his reply brief, Plaintiff points out that schizophrenia is a lifelong, cyclical disorder, and he also contends that his attempts to work should weigh in his favor. [Doc. 14 at 1-2 (citing SSR 96-7p)].

The Court has carefully considered the ALJ's decision in light of Plaintiff's allegations of error but concludes that Plaintiff has not established grounds for reversal. To be sure, the record does contain evidence that would have supported a more restrictive RFC. [*See, e.g.*, R124 (Plaintiff's statement that because he is paranoid, he

48

isolates himself, looks out the window, and checks the door), 127 (Plaintiff's report that it is difficult to go to the grocery store because he feels like customers are talking about him), 129-31 (Plaintiff's reports of mostly staying home alone because he is afraid of the outside world and of sometimes having difficulty with supervisors and coworkers due to paranoia), 142 (Plaintiff's mother's report that Plaintiff is easily frustrated by others' attempts to make him interact), 279-81 (Plaintiff's reports of paranoia to Dr. Berger and Dr. Berger's opinion that Plaintiff history of quitting jobs due to paranoid delusions was plausible and would likely be repeated without psychotherapy), 325 (medical notes recounting Plaintiff's report that he avoids crowds and feels like people are talking about him, plotting against him, or are out to get him), 331 (medical notes recounting Plaintiff's report that he lost his job because he was paranoid and did not go to work), 352 (medical notes recounting Plaintiff's reported history of quitting work due to paranoia)].   However, as set forth above, it is not the Court's job to reweigh the evidence or substitute its judgment for that of the ALJ; so long as the ALJ applied the proper legal standards and substantial evidence supports his conclusions, his decision stands.  *See supra* Part V.  Here, the ALJ met his obligations.

First, the Court finds that the ALJ did not err by considering Plaintiff's past work to be evidence that he could work despite his diagnosis and symptoms.  It is true that

AO 72A
(Rev.8/8
2)

attempts to work are often viewed as evidence of a desire to work and thus may weigh in the claimant's favor. *See* SSR 96-7p. Nevertheless, the Court finds that in this particular case—where Plaintiff claimed inability to work, yet was able to return to work for a sustained period of years—it was not unreasonable for the ALJ to find that the work history undermined Plaintiff's credibility as to the severity of his symptoms and their impact on his ability to work. [*Compare* R229 *with* R104]. Additionally, Plaintiff admits that he has not attempted work since he quit his job in 2010. [R42].

Second, the undersigned finds no reversible error in the ALJ's notation that Plaintiff attends church regularly and speaks with his mother and children daily. While it is true that Plaintiff stated that when he goes to church he sits in the back alone and that his daily conversations with his mother and children are by telephone, the ALJ did not suggest that Plaintiff's church attendance was interactive or suggest that Plaintiff was out visiting his children every day, but instead recognized and expressly considered Plaintiff's stated preference for spending time at home due to paranoia and his reports of having a limited social life. [*See* R27, 128]. It also bears noting that Plaintiff somewhat overstates his tendency to be alone, as he reported that in addition to the daily telephone calls, his children also visit him from time to time, [R128], he visits

friends, [R43], and he visits his children on weekends, [R43], and medical notes from February 2011 indicate that Plaintiff had been going to exercise at a gym, [R328].

Third, the Court finds no basis for a determination that the ALJ impermissibly found that the lack of reports of paranoia in 2011 and 2012 showed an ability to work. [*See* Doc. 12 at 13].  Review of the ALJ's decision reveals that he did not rely on the records to show that Plaintiff could work but instead properly considered the records as part of his evaluation of Plaintiff's credibility, [R30-31].  *See Jarrell v. Comm'r of Soc. Sec.*, 433 Fed. Appx. 812, 814 (11th Cir. July 8, 2011) (affirming a credibility determination that took into account evidence of a period of conservative treatment and a period of no treatment at all as weighing against the plaintiff's allegations of debilitating pain).  Here, the medical records not only lacked reports of paranoia but also included notes of Plaintiff's repeated reports that he was asymptomatic.  [*See, e.g.*, R323-24, 326-28, 352].  Thus, the record contains substantial evidence to support the ALJ's determination that Plaintiff's claims of limitation were not entirely credible.

Fourth, the Court does not agree with Plaintiff's representation that the ALJ accepted that Plaintiff has significant difficulty getting along with authority figures or coworkers due to paranoid thoughts or that the record lacks substantial evidence to support the ALJ's decision not to include such limitations in the RFC.  [*See* Doc. 12

51

at 9-10 [citing R27, 30]].  In the sections of the decision that Plaintiff cites, the ALJ did not state that he accepted that Plaintiff had significant difficulties getting along with authority figures or with other social functioning but instead simply acknowledged Plaintiff's report that he had some difficulty getting along with his father because his father does not understand his illness, Plaintiff's report that he gets along with authority figures "ok," and "sometimes . . . [has] trouble with bosses because [he] think[s] they have something against [him]" or "think [he's] crazy," and Dr. Berger's opinion that Plaintiff had some social functioning limitations due to his delusional thinking and was likely to benefit from psychotherapy targeted at teaching him skills to manage the delusional thinking.  [R27, 30, 129-30, 281].  As discussed above, the undersigned finds that it was reasonable for the ALJ to interpret Dr. Berger's examination notes and opinion as supportive of an RFC encompassing unskilled light work, *see supra* Part VI.B.1., and the ALJ further supported his opinion by expressly referencing Dr. Berger's opinions that Plaintiff had adequate social skills, could adhere to a typical work schedule, and could maintain an adequate pace in a work setting, [R27, 30-31], pointing to myriad treatment records showing that Plaintiff rarely reported experiencing paranoid delusions on medication, either before or after he stopped working, [R29-31], and assigning "great weight" to the opinion of the state agency reviewing physician, who found that Plaintiff's mental impairment was not severe, [R31].  Thus, the

52

undersigned concludes that there is substantial evidence to support the ALJ's decision not to restrict Plaintiff's exposure to supervisors or coworkers.

Fifth, the undersigned finds no reversible error arising from the ALJ's decision to limit the RFC to infrequent, casual contact with the public, despite his decision not to restrict Plaintiff's contact with supervisors or coworkers.  [*See* Doc. 12 at 9-12]. Here, the evidence is materially different from the evidence described in *Young* and *Pfeiffer*, the cases upon which Plaintiff relies:  in *Young*, a medical expert had provided an opinion that the plaintiff was moderately limited in his ability to interact appropriately with the general public and respond to criticism from supervisors, *Young*, 362 F.3d at 1002, and similarly, in *Pfeiffer*, a medical expert had opined that the plaintiff had marked social limitations, *Pfeiffer*, 576 F. Supp. 2d at 962, yet in both cases, the ALJ—without explaining why—credited the social limitations only as to certain subgroups, *see Young*, 362 F.3d at 1002 (finding error where the ALJ limited contact with only the public and coworkers despite medical opinion stating that plaintiff was also moderately limited in his ability to respond to criticism from supervisors); *Pfeiffer*, 576 F. Supp. 2d at 959, 962 (finding error where the ALJ found ability to interact with coworkers despite medical opinion that plaintiff's limitations were "marked" in all spheres).  Here, in contrast, the medical opinions to which the ALJ gave "great weight" were both consistent with a finding of no social limitations at all, and

53

the ALJ explained that the limitations he did include in the RFC were there because he had given Plaintiff the benefit of the doubt.  [R31, 278-83, 307-19].  Thus, it appears that the ALJ was generous in crafting an RFC limited to "no more than infrequent, casual contact with the public" and that substantial evidence supports his decision not to include further restrictions.

### 4.   *"Unsupported and Contradictory" RFC*

Finally, Plaintiff contends that the ALJ's mental RFC is unsupported and contradictory because the ALJ incorrectly noted that Dr. Berger opined that Plaintiff was capable of performing semi-skilled tasks when the opinion discussed only unskilled work, [R27, 278-81], and the ALJ gave "great weight" to the opinion of state-agency psychologist Dr. Grubbs, yet found that Plaintiff's schizophrenia was severe and imposed limitations, [R31].  Again, the Court finds no basis for reversal in either argument.

It is true that the ALJ incorrectly noted that Dr. Berger found Plaintiff's attention and concentration to be intact for semi-skilled tasks.  [R27].  However, the jobs the VE testified were available to a person of Plaintiff's age, education, and RFC were unskilled positions.   [R49].   Thus, although the ALJ erred in his reference to semi-skilled tasks, the VE testimony rendered the error harmless.

AO 72A
(Rev.8/8
2)

It is also true that the ALJ gave "great weight" to Dr. Grubbs's opinion that Plaintiff's schizophrenia is not severe, yet nevertheless found that Plaintiff's schizophrenia is severe and imposed some limitations. [R28, 31]. As discussed above, the Court finds this apparent contradiction to be resolved by the ALJ's explanation that although the medical opinion evidence suggests that Plaintiff's mental limitations are minimal, he gave Plaintiff the benefit of the doubt "and considered and accounted for any potential limitations he may experience as a result of his impairments" in tailoring the RFC. *See supra* Part VI.B.3. Thus, the Court finds no reversible error arising from the ALJ's assignment of "great weight" to the reviewing physician's opinion and his decision to craft a more restricted RFC.

## VII. CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner. The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED**, this the 18th day of March, 2016.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)